1

2

3

4

5

6

7

FILED & ENTERED

SEP 10 2008

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY williams  DEPUTY CLERK

8    **UNITED STATES BANKRUPTCY COURT**

9    **CENTRAL DISTRICT OF CALIFORNIA**

10    **SAN FERNANDO VALLEY DIVISION**

11

| | |
|---|---|
| 12  In re: | Bk. No. SV 06-12366 MT |
| 13  DANNY R. STILL, JR., | Chapter 7 |
| 14  Debtor(s). | Adv. No. SV 07-01152 MT |
| 15  _____ | **MEMORANDUM OF DECISION** **AFTER TRIAL** |
| 16  DANNY R. STILL, JR., an individual; and DIANE TRISTAN, an individual; | |
| 17  Plaintiff(s), | |
| 18  v. | |
| 19  ARAM ARAKELYAN, an individual; ANAHITA ARAKELYAN, an individual; SASUN ARAKELYAN; and DOES 1 through 100, inclusive, | |
| 20 | |
| 21  Defendant(s) | |

22    **I. BACKGROUND**:

23
On December 18, 2006, Danny R. Still, Jr. filed a voluntary chapter 13

24
petition in case no. SV 06-12366 MT.  On July 13, 2007, Danny R. Still, Jr. and

25

26

1    Diane Tristan (collectively known as "Plaintiffs") initiated an adversary

2    proceeding, case no. SV 07-01152 MT, against Aram Arakelyan, Anahita

3    Arakelyan, and Sasun Arakelyan (collectively known as "Defendants") alleging a

4    foreclosure fraud.[1]

5        On August 17, 2007, Aram and Anahita filed an Answer to the Complaint

6    ("Answer") raising various affirmative defenses.[2]  Sasun failed to file an answer.

7        The parties filed a Joint Pretrial Conference Statement and Order ("Pretrial

8    Order") on April 17, 2008, detailing the issues of fact and issues of law that

9    remained to be litigated.  Plaintiffs filed a trial brief on April 29, 2008, which the

10   Court acknowledged receipt of at the beginning of the trial.  Defendants did not

11   object to anything in Plaintiffs' trial brief at that time.

12

13

14

15   _____

16   [1] Plaintiffs' Complaint ("Complaint") alleged the following causes of action: (1) violation of the
     Home Equity Sales Contract Act, Cal. Civil Code  § 1695 et seq., against Aram Arakelyan
     ("Aram") and Sasun Arakelyan ("Sasun"); (2) violation of the Mortgage Foreclosure Consultants
17   Act, Cal. Civil Code § 2945 et. seq., against Aram; (3) intentional misrepresentation against
     Aram; (4) negligent misrepresentation against Aram; and (5) conspiracy to block, transfer and
     defraud through fraudulent transfer against Aram Arakelyan and Anahita Arakelyan ("Anahita").
18   See Complaint at 4-10.  Plaintiffs' Complaint sought the following relief: (1) all conveyances
     between Aram and Anahita be set aside and title re-vested in Aram; (2) the owners of the subject
19   properties be declared resulting trustees and be ordered to hold said property as constructive
     trustees for Plaintiffs; (3) general damages to be determined according to proof; (4) special
20   damages to be determined according to proof; (5) reasonable attorney's fees pursuant to Cal.
     Civil Code § 1695 et seq.; (6) treble damages pursuant to Cal. Civil Code § 1695 et. seq.; (7)
21   reasonable attorney's fees pursuant to Cal. Civil Code § 2945 et. seq.; (8) treble damages
     pursuant to Cal. Civil Code § 2945 et. seq.; (9) punitive damages to be determined according to
22   proof; (10) costs of suit incurred herein; and (11) such other and further relief as the Court may
     deem just and proper.  See Complaint at 10-11.
23   [2] The Answer asserted the following affirmative defenses: (1) Plaintiffs have failed to allege
     sufficient facts upon which this Court may grant relief; (2) estoppel by conduct; (3) comparative
     fault; (4) any injury or damages suffered or sustained by Plaintiffs was in whole or in part
24   proximately caused by persons or entities other than Defendants; (5) intervening and/or
     superseding causes; (6) mitigation of damages; (7) doctrine of laches; (8) vicarious liability; (9)
25   unclean hands; (10) doctrine of offset; (11) Plaintiffs' claims are speculative and not a basis for
     recovery; and (12) ratification.  See Answer at 5-6.

26

1    From April 29, 2008 to May 1, 2008, a trial was held.  Elliot Blut appeared

2  on behalf of Plaintiffs, and Richard Moneymaker appeared on behalf of Aram and

3  Anahita. No appearances were made on behalf of Sasun.

4    On June 24, 2008, the Court allowed additional briefing in this case further

5  addressing the applicability of Aram's real estate license to the causes of action.

6  On June 27, 2008, Aram and Anahita filed a Reply Brief on Issue of Defendants'

7  Real Estate License.  On July 8, 2008, Aram and Anahita filed a Reply Brief on

8  Issue of Damages.

9

10  **II. FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

11    These findings of fact and conclusions of law are rendered pursuant to

12  F.R.C.P. Rule 52, made applicable by F.R.B.P. Rule 7052.[3]  Aram Arakelyan,

13  Tommia Richardson ("Tommia"), Danny R. Still, Jr. ("Danny"), Diane Tristan

14  ("Diane"), Cory Kessinger ("Cory"), and Irma Tristan ("Irma") testified as

15  witnesses at trial.  Upon consideration and review of the Complaint, Answer,

16  Pretrial Order, Plaintiffs' Trial Brief, Aram and Anahita's reply briefs, counsels'

17  oral arguments, the documents admitted into evidence, and the oral testimony at

18  trial, the Court makes the following findings of fact and conclusions of law

19  detailed below.

20

21    **Findings of Fact**

22

23

24  [3] To the extent that any of the findings of fact constitute conclusions of law, they are incorporated herein as conclusions of law. Conversely, to the extent that any conclusions of law constitute

25  findings of fact, they are incorporated herein as findings of fact.  Evidence was taken pursuant to F.R.C.P. Rule 43, made applicable by F.R.B.P. Rule 9017.

26

Plaintiff Danny R. Still, Jr. is married to Plaintiff Diane Tristan.  Danny's

current bankruptcy filing is his fourth filing. Diane did not file bankruptcy.

Plaintiffs owned the real property located at 40615 176th Street East, Lancaster,

CA 93535 (the "Property") but were at risk of losing their home in foreclosure

because of missed mortgage payments.    The Property was the first home that

Plaintiffs had bought, and Plaintiffs especially wanted to keep the Property

because it was picked out by their daughter, who had passed away in a car

accident in 2002.

Around September 2005, Plaintiffs received a letter from "Capital Needs

Network," signed by Aram, soliciting business from property owners in

bankruptcy or default situations.  See Pls.' Ex. 11.  The letter was addressed to

Danny Still and read:

> We specialize in no asset no income verification loans.  We provide
> low interest rate financing for property owners in bankruptcy and
> default situations.  Closing time for this loans are one to two weeks.
> [sic]  **If default or trustee sale notice has been filed, then we
> can extend a quick (within 2-3 days) loan to cure the default**.
> Whether a new home loan is what you seek or to refinance your
> current home loan at a lower interest rate and payment, we can
> help!
>
> Refinance your home with us and include all of those pesky credit
> card bills or use the extra cash for that pool you always wanted…
>
> Where others say NO, we say YES!!!  Even if you have been turned
> down elsewhere, we can help!  Easy terms!  **Highest quality loans
> with most economical rates and the easiest qualification!  Take
> action now!**

See Pls.' Ex. 11.  Aram testified that his company did not send out this letter, but

this was not credible.  Aram also testified that he was the owner of the company

at that time, and the company's address and his email were correct.  Aram's

1    testimony was purposefully vague, playing word games as to whether an agent

2    of his had sent this or whether he personally sent it.  Around the same time,

3    Diane contacted Aram directly to try to save her home from foreclosure.  Plaintiffs

4    then met with Aram multiple times to arrange for cure of the default and for

5    "refinancing" on their home.[4]

6         A central factual dispute concerns whether Aram gave Plaintiffs $102,500

7    in cash at two separate meetings, or whether these funds were pocketed by

8    Defendants. On or about October 5, 2005, Aram claims to have made a personal

9    loan to Plaintiffs in order to cure their default and allow them time to sell the

10    house and repay him.  There is no dispute that a foreclosure sale was originally

11    scheduled for the Property for October 6, 2005, but the sale was cancelled and

12    the default was cured on October 5, 2005 when Aram delivered a cashier's check

13    in the amount of $19,472.01 to Loan Star to reinstate the first deed of trust.  <u>See</u>

14    Pls.' Ex. 3.

15         Plaintiffs in fact signed a Promissory Note dated October 4, 2005,

16    promising to pay $80,500 to Aram with a maturity date of January 6, 2006.  <u>See</u>

17    Defs.' Ex. 103.  Plaintiffs also signed an Instruction to distribute loan proceeds

18    dated October 4, 2005, which cured the loan default and reinstated the loan.  In

19    that document, they also acknowledged receipt of $60,500 in cash.  <u>See</u> Defs.'

20    Ex. 105.   Aram recorded a deed of trust on the Property on October 7, 2005, for

21    $80,500.  Plaintiffs claim that they have no idea what they signed, that they never

22

23

---

24   [4] Aram attempted to portray most of this transaction as having been arranged by Irma Tristan, a
relative of the debtor, who appears to also work as a bankruptcy petition preparer. Irma did not
25   introduce Plaintiffs to Aram, and Irma had no knowledge of the dealings between Aram and
Plaintiffs until about September 2006.  <u>See</u> Pls.' Ex. 18.

26

saw these representations in the documents they signed, and that they never

received this cash.

Aram testified that the $80,500 he gave to the Plaintiffs was borrowed

from various individuals in the Armenian community, whose identities he could

not reveal, but he had no receipts or evidence of the borrowing.  Aram stated that

the money was not his own money but that he was personally liable for the

amount.  Aram also testified that he gave Plaintiffs $60,500 in cash, in $2,000

bundles and five $100 dollar bills, in a brown paper bag, and no other parties

witnessed this transaction.  He claimed the cash was just waiting for him "from

his sources" when he got back to the office to meet with Plaintiffs.  When pressed

on how he would pay back "his sources," he stated that he has different sources

and new sources would pay back the older sources.  He could not recall which

sources were which, but insisted that "the Armenian community is a small one,"

and "confidentiality is strictly enforced."

Defendant did not testify at trial about who he attempted to sell Plaintiffs'

loan to after he made it.  Although the exact timing was never clarified, at trial he

stated that he did not run Plaintiffs' credit report until at least after the default was

cured and he allegedly had given Plaintiffs $60,500.  He testified that because of

Plaintiffs' bad credit, the lenders he contacted wanted too deep a discount and

would never approve a four month term loan.  He also filed a declaration in the

course of pretrial motions listing a few lenders he contacted.  Aram did not obtain

a signed contract from Plaintiffs for the services he allegedly provided.

Around the same time period, Aram discussed additional financing with Plaintiffs.  Aram told Plaintiffs that the only way to save the Property was to sell the Property to a strawperson, who would then quitclaim the Property back to Plaintiffs.  Plaintiffs would essentially cash out the equity on the Property, but they would be left with larger mortgage payments in return.  Plaintiffs did not truly understand the implications of the transaction.  At Aram's suggestion, Plaintiffs made several attempts to find someone to act as a strawperson, including Richard Myers and Sandy Wood.  See Defs.' Ex. 107.  However, these people did not have good credit, so they were not used as the strawperson.

Aram then suggested using Sasun as the strawperson, and Plaintiffs agreed.  There is conflicting testimony over who found Sasun as a strawperson.  Based on the testimony by Diane, Aram, Tommia, and Irma and the exhibits showing connections between Aram and Sasun, the Court finds that Aram knew and arranged for Sasun to act as a strawperson.  Aram's assertion that he did not know Sasun before this transaction was completely incredible.  Sasun received at least $22,500 to act as a strawperson.  See Defs.' Ex. 111.

In early 2006,[5] Plaintiffs sold the Property to Sasun for $290,000, see Pls.' Ex. 7.  Plaintiffs signed numerous documents in relation to this transaction.  Among those documents, Plaintiffs signed an Instruction to distribute loan proceeds dated February 31, 2006, giving $36,399.66 to Aram as down payment for Sasun and acknowledging Plaintiffs' receipt of $42,000 in cash from Aram.  Diane testified that she did not remember signing this document and that she

---

[5] The Pretrial Order stated that this occurred in 2007, but from the evidence on the record, it appears that the parties meant 2006.

never received any cash from Aram.  On January 29, 2006, Sasun quitclaimed the residence back to Plaintiffs, and the deed was recorded on February 18, 2006.[6]  See Pls.' Ex. 9.  Diane testified that Plaintiffs received a total of $19,800.56 from the transaction, $10,000 was used to buy a car and the rest was used to make subsequent mortgage payments.  In support of this testimony, Diane introduced her bank statement showing the receipt of these funds.  See Pls.' Ex. 6.

Documents containing Diane and Danny's signatures on documents showing they owed Aram $80,500 (see, e.g., exhibit 104) were also notarized. Cory Kessinger testified that he routinely reviewed papers with people where the Document Center was used and he notarized signatures.  While he appears to have complied with the notary requirements of verifying signatures, he testified that he had no specific recall of this transaction and he notarizes documents for over 100 people a month.  He verified that he notarized this document at 4:30 p.m.  Diane stated that she felt rushed and had to sign things quickly at the end of the day.  Cory's testimony really does not weigh in either direction because he does not support either Diane or Aram's claims.  If anything, it appears that he was willing to imply that Plaintiffs knew what they were signing because Aram does extensive business with the Document Center.

Shortly after what Plaintiffs believed was a refinancing, they began receiving statements in Sasun's name.  Plaintiffs also noticed that their mortgage payments increased substantially.  Plaintiffs made two mortgage payments on

---

[6] Again, the Pretrial Order listed the date as 2007, but the evidence shows that the parties meant 2006.

the Property, but the following two mortgage payments were returned.  It appears that the loan company refused to accept the payments.  Plaintiffs contacted Aram about the problem, and Aram suggested that Plaintiffs could do another financing deal, which Plaintiffs refused.  Aram also advised Plaintiffs to pay the mortgage company using a cashier's check under Sasun's name, which Plaintiffs also refused to do.  Plaintiffs were in default, and a foreclosure sale was scheduled for December 11, 2006.[7]  See also Defs.' Ex. 114.

Danny filed for chapter 13 bankruptcy on December 18, 2006, in a last attempt to save the Property.  However, Danny was unable to keep up the chapter 13 payments.  Around October 2007, the Property was foreclosed, and Plaintiffs moved out.

Defendant Aram is married to Defendant Anahita.  In March 2007, Aram transferred title to the property known as Unit 204, 345 W. Alameda Ave, Burbank, CA 91506 to Anahita for no consideration via a quitclaim deed.  See Pls.' Ex. 10.

Aram has a real estate license as the designated licensee and officer of Real Act, Inc.  See Pls.' Ex. 15.  Aram had an individual real estate license as a broker, but the individual broker license expired on December 5, 2002 and was not active as of September 20, 2007.  See Pls.' Ex. 14.

Tommia Richardson was another victim of Aram's "home financing assistance."  Diane introduced Tommia to Aram when Tommia faced foreclosure.  After meeting with Aram, she believed she could refinance, pay off the default

---

[7] Again, the Pretrial Order listed the date as 2007, but the evidence shows that the parties meant 2006.

9

and "get some cash out of the property."  The escrow documents demonstrate that Sasun was also used for this sale.  See Ex. 107.  She stated that every time she asked Aram why Sasun's name was all over the papers, he changed the subject.  Tommia admits that Aram's "refinancing" cured her default, and that she got $63,000 out of the deal.  She denies ever receiving the additional $55,000 in cash Aram claims he gave her.  Her $700 monthly payment increased to $1700.  While she made the payments for a while from the money she received, her house was also lost to foreclosure the following year.

Although the transaction was never explained, Plaintiffs demonstrated that Aram engaged in other property transfers with Sasun concerning a property owned by Ewa Maria Baczkowska, who did not testify.  Sasun is listed as the grantee of her property, with a subsequent quitclaim deed back to her on June 29, 2005, See Ex. 21. Aram is then listed as quitclaiming the property back to her on August 29, 2006, with Cory Kessinger again notarizing the transaction.  See Exhibit 22.

Although there is conflicting testimony between Aram and Diane and Danny about how much was actually received through the transaction, there was simply no evidence showing Plaintiffs in possession of $102,000.00 cash or any purchases made evidencing such an infusion of cash.  Defendant argues that he did not have the burden of proof to show that Plaintiffs had received this cash.  This is correct.  Plaintiffs had the burden of proof to show that Defendants defrauded them by stealing any equity left in their home through the sophisticated means alleged.  Aram attempted to refute Plaintiffs' proof, however,

by claiming that the cash he received in the escrow closing was because he paid this money to Plaintiffs previously.  The evidence and credibility of the witnesses bearing on such an assertion can be evaluated to see whether this defense is valid.

Aram claims that the documents Plaintiffs signed show that they got the cash he says he gave them and that this ratification of the cash receipt precludes them from testifying otherwise.  Plaintiffs' signatures on these documents evidencing their knowledge of transfers of funds to Aram  do raise concerns and caused the Court to carefully scrutinize their testimony and the circumstances each witness described.

Plaintiffs were in a desperate situation at the time Aram contacted them. They were one day away from a foreclosure of their home, they had lost a child in a car accident less than three years earlier, three other children still resided at the house with them, their only car had been repossessed, and Danny's chapter 13 case attempting to save the home had been dismissed.  Aram demonstrated immediately that he was capable of stopping the foreclosure and was willing to "lend" them the money they needed to turn the situation around.  Diane was credible when she testified that she signed any papers Aram put in front of her because she trusted him to save their home. She, in fact, had a concrete basis other than the solicitation letter and initial sales pitch because he had fronted the funds to cure the loan default.  From observing Danny and Diane's interaction in court for two days, and Danny's demeanor and testimony, it is also credible that he had very little understanding of what this transaction was all about and simply

11

did what Diane told him. Neither of them has any financial or business expertise, and they were first time homebuyers.  Their assertion that the documents were either filled in later or that they signed not understanding what they said is consistent with the nature of the foreclosure scheme and the circumstances here.

To believe Aram's version of events and his central assertion that he gave over $100,000 in cash to the plaintiffs requires believing the following:

(1) That two solicitation letters were not sent from him to Plaintiffs even though his company is on the letterhead, in whose name he was conducting similar business at that time, and his name is signed on the letter;

(2) That Plaintiffs came to him through Irma Tristan and that he was willing to immediately lend $19,472 to cure a default for her relatives "as a favor" even though he had only done business with her years ago and admittedly had not talked to her in three to four years.  No loan documents had been filled out at that point, no collateral had been posted yet and Aram had done no independent investigation of Plaintiffs;

(3) Aram would have such large sums of cash sitting on his desk and hand over such large sums with no witnesses present;

(4) Aram conducted a nearly identical transaction with Tommia Richardson, and again had such large sums of cash available, and the recipient again denied receiving the cash; and

(5) Aram was willing to take a chance that the financing would all come through for the straw borrowers such that he would advance over

1   $150,000 in cash to two different homeowners with poor credit ratings

2   even though the default had already been cured and they could wait and

3   take the equity out a few weeks later at closing of the escrow.

4   Aram's version of events here simply makes no sense in light of what he would

5   like this Court to believe.  Plaintiffs are certainly not to be admired in their

6   willingness to turn over their affairs to Aram with a complete lack of concern

7   about the bank fraud they were all willing to perpetuate.  Their description of

8   events concerning who received what payments in this transaction, however, is

9   credible.

10   Aram testified that at one point Diane asked him to get $20,000 for her out

11   of the refinancing, but that he was lucky enough to get $19,500 for her.  It would

12   be odd for this conversation to have occurred if, in fact, Aram had just given

13   Diane $60,500 only a month earlier.

14   Many of the documents were purposefully drafted by Aram to conceal the fact

15   that he was using Plaintiffs' financial distress and impending loss of their home to

16   trick them into turning over the remaining equity on the home to him.

17

18   While specific findings are detailed throughout this memo, the Court

19   generally finds Aram's testimony to be not credible and partially fabricated based

20   on his demeanor, evasiveness, and a close examination of the exhibits.  The

21   Court finds Diane to be credible in most respects.  The Court finds Danny to be

22   credible that he never received the cash Aram claimed he did.[8]  Danny's other

23   activity in his repeat chapter 13 filings raise questions as to his good faith in

24   _____

25   [8] Danny's credibility on other matters is questionable and other witness's testimony has been
relied on to determine what happened.

26

1   those cases but are not necessary to resolve the issues here. [9]   The Court finds

2   Tommia credible in her description of events and credible that she never

3   received cash from Aram.  The Court also finds Cory to be generally credible

4   although lacking in specific recollection of relevant points.  Finally, the Court finds

5   Irma credible on her description of the events, that she found out about the "loan"

6   around September 2006, that she did not introduce Aram to Plaintiffs, and that

7   she never knew Sasun nor suggested that Sasun act as a strawperson.

8   **Conclusions of Law**:

9       This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. §

10  157(b)(1).  This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A),

11  (E), (K), and (O).

12  A.  Cal. Civil Code § 1695 et. seq. (Home Equity Sales Contract Act):

13      The Home Equity Sales Contract Act ("HESCA"), codified in California

14  Civil Code § 1695 et. seq., requires buyers of homes in foreclosure to provide a

15  written contract making necessary disclosures.  See Cal. Civil Code §§ 1695,

16  1695.2, 1695.3, and 1695.6 (2008).  HESCA "closely regulates 'transactions

17  between an equity purchaser and an equity seller resulting in the sale of

18  residential property in foreclosure.'"  Hoffman v. Lloyd, 2008 WL 298820 at 3

19  (N.D. Cal.) (citing Segura, 5 Cal. App. 4th at 1035).  HESCA "shall be liberally

20  construed" to effectuate the intent and purposes of the statute.  Cal. Civil Code §

21  1695(d)(2).  HESCA "contains specific, detailed regulations concerning the

22

23

---

24  [9] Danny submitted false documents in his 2003 chapter 13 case attempting to demonstrate that
    he had contribution income for the chapter 13 plan.  He claims to know nothing about the
25  documents, stating that the law firm created and filed them without his knowledge.  Danny's willful
    ignorance is apparent throughout this case.

26

1   content and form of contracts for the sale of a home in foreclosure," and "the

2   written contract must contain two separate notices of the homeowner's right to

3   cancel [within a specified period of time]."  Hoffman, 2008 WL 298820 at 3.  It is

4   undisputed that Aram and Sasun did not obtain a signed contract from Plaintiffs

5   pursuant § 1695 et. seq.

6         To fall within the requirements of HESCA, (1) the residence must have

7   been in foreclosure pursuant to § 1695.1(b), (2) the seller must have been an

8   "equity seller" pursuant to § 1695.1(c), and (3) the buyer must have been an

9   "equity purchaser" pursuant to § 1695.1(a).  See also §§ 1695.2 and 1695.6.

10   Under § 1695.1(b), "residence in foreclosure" and "residential real property in

11   foreclosure" are defined as:

12

13          residential real property consisting of one- to four-family dwelling
            units, one of which the owner occupies as his or her principal place

14          of residence, and against which there is an outstanding notice of
            default, recorded pursuant to Article 1 (commencing with Section

15          2920) of Chapter 2 of Title 14 of Part 4 of Division 3.

16   It is undisputed that the Property is a "residence in foreclosure" because the

17   Property consisted of one family dwelling unit, was occupied by the owners, and

18   there was an outstanding notice of default.  Under § 1695.1(c), "equity seller"

19   means "any seller of a residence in foreclosure."  It is also undisputed that

20   Plaintiffs were "equity sellers" because they sold their residence in foreclosure.

21   Under § 1695.1(a), "equity purchaser" means:

22          any person who acquires title to any residence in foreclosure,
            except a person who acquires title as follows: (1) For the purpose

23          of using such property as a personal residence.  (2) By a deed in
            lieu of foreclosure of any voluntary lien or encumbrance of record.

24          (3) By a deed from a trustee acting under the power of sale
            contained in a deed of trust or mortgage at a foreclosure sale

25

26

conducted pursuant to Article 1 (commencing with Section 2920) of Chapter 2 of Title 14 of Part 4 of Division 3.  (4) At any sale of property authorized by statute.  (5) By order or judgment of any court.  (6) From a spouse, blood relative, or blood relative of a spouse.

It is undisputed that Aram received a deed of trust on the Property on October 7, 2005.  See Defs.' Ex. 104.  However, the evidence shows that Aram never acquired title to the Property, so, under these facts, he would not constitute an "equity purchaser" pursuant to § 1695.1(a).

HESCA was enacted to protect owners of residence in foreclosures, including homeowners in financial distress from fraud, deception, and unfair dealings by home equity purchasers.  § 1695(a).  HESCA also addresses the problems that:

> [d]uring the time period between the commencement of foreclosure proceedings and the scheduled foreclosure sale date, homeowners in financial distress, especially the poor, elderly, and financially unsophisticated, are vulnerable to the importunities of equity purchasers who induce homeowners to sell their homes for a small fraction of their fair market values through the use of schemes which often involve oral and written misrepresentations, deceit, intimidation, and other unreasonable commercial practices.

Cal. Civil Code § 1695(a).  Plaintiffs, who were financially unsophisticated and vulnerable to the pressure of an impending foreclosure sale, are exactly the type of people that HESCA intended to protect.  Despite the evidence showing that Aram appeared to be the "mastermind" behind the scheme, under the facts of this case, he does not constitute an "equity purchaser" under § 1695.1(a).  Plaintiffs did not proceed under an agency theory, thus the evidence showing Aram to be liable under HESCA is insufficient.

16

On the other hand, it is undisputed that Sasun did acquire title to the Property.  Moreover, Sasun did not acquire title in any manner described in California Civil Code § 1695.1(a)(1) to (6).  Thus, Sasun would constitute an "equity purchaser" under § 1695.1(a).  Because Sasun did not provide a written contract as required by §§ 1695.2, 1695.3, and 1695.6, the Court finds that Sasun violated HESCA.  Under § 1695.7, Plaintiffs are entitled to recover from Sasun actual damages, reasonable attorneys' fees and costs, exemplary damages and/or equitable relief, and treble damages.

B.  Plaintiffs' Claim for Relief under Cal. Civil Code § 2945 et. seq. (Mortgage Foreclosure Consultants Act) against Aram:

The Mortgage Foreclosure Consultants Act ("MFCA"), codified in California Civil Code § 2945 et. seq., "requires foreclosure consulting contracts to be in writing, and is intended…to 'safeguard the public against deceit and financial hardship…prohibit representations that tend to mislead and…encourage fair dealings in the rendition of foreclosure services."  In re McNeal, 286 B.R. 910, 911 (Bankr. N.D. Cal. 2002).  The MFCA "shall be construed liberally" to effectuate the intent and achieve the purposes of the statute. § 2945.(c)(2).  The MFCA requires a "foreclosure consultant," defined in California Civil Code § 2945.1(a), to obtain a written contract making necessary disclosures from the property owner.  See Cal. Civil Code §§ 2945, 2945.2, and 2945.3.  It is undisputed that Aram did not obtain a signed contract from Plaintiffs pursuant to

17

California Civil Code § 2945.3 at any time.  It is also undisputed that a notice of

default was recorded on the Property.

To be liable under MFCA, the Court must find that Aram is a "foreclosure

consultant" pursuant to California Civil Code § 2945.1 and does not fall within the

exceptions described in California Civil Code § 2945.1(b).  California Civil Code §

2945.1(a) states that "foreclosure consultant" means:

> any person who makes any solicitation, representation or offer to
> any owner to perform for compensation or who, for compensation,
> performs any service which the person in any manner represents
> will in any manner do any of the following: (1) Stop or postpone the
> foreclosure sale; (2) Obtain any forbearance from any beneficiary
> or mortgagee; (3) Assist the owner to exercise the right of
> reinstatement provided in Section 2924c; (4) Obtain any extension
> of the period within which the owner may reinstate his or her
> obligation; (5) Obtain any waiver of an acceleration clause
> contained in any promissory note or contract secured by a deed of
> trust or mortgage on a residence in foreclosure or contained in that
> deed of trust or mortgage; (6) Assist the owner to obtain a loan or
> advance of funds; (7) Avoid or ameliorate the impairment of the
> owner's credit resulting from the recording of a notice of default or
> the conduct of a foreclosure sale; (8) Save the owner's residence
> from foreclosure; (9) Assist the owner in obtaining from the
> beneficiary, mortgagee, trustee under a power of sale, or counsel
> for the beneficiary, mortgagee, or trustee, the remaining proceeds
> from the foreclosure sale of the owner's residence.

Aram falls within the definition pursuant to Cal. Civil Code § 2945.1(a) in

several aspects.  First, the Court finds that Aram solicited Plaintiffs by first

sending them a letter and then soliciting them in a personal meeting.  <u>See</u>

Pls.' Ex. 11.  Second, Aram received compensation for his services

because the Court finds no evidence showing that Plaintiffs received cash

in the amount stated on the documents signed by Plaintiffs.  Aram

retained the amount that he claimed Plaintiffs had received in cash.  Aram

indicated that he was expecting at some point to receive some fee for his

services, although he could not explain what his fee structure was.

Although Aram testified also that he received no compensation for this

transaction and that he was doing this only as a favor to Irma, this was

simply not credible.  Irma, Diane, and Tommia's testimony was more

credible that Aram was in the business of refinancing homes in default for

a fee.  Tommia's financing transaction was very similar to Plaintiffs',

showing that Aram did residential financing in his business.  In addition,

the very escrow documents Aram relies on to show that Danny and Diane

knew how much cash was being taken out at closing shows large payoff

charges going to Aram.  <u>See</u> Def.'s Ex. 108.

Third, the evidence shows that Aram represented that he would

(and indeed did) stop or postpone the October 2005 foreclosure on the

Property and that he assisted Plaintiffs in reinstating their loan and then in

obtaining a new loan.  Thus, Aram qualifies as a "foreclosure consultant"

pursuant to Cal. Civil Code § 2945.1 unless he falls within the exceptions

listed in California Civil Code § 2945.1(b).

Aram argues that he is exempt from the definition of "foreclosure

consultant" under § 2945.1(b)(3).  Under California Civil Code

§2945.1(b)(3):

> A foreclosure consultant does not include any of the following:…(3)
> A person licensed under Part 1 (commencing with Section 10000)
> of Division 4 of the Business and Professional Code when the
> person makes a direct loan…For the purposes of this paragraph, a
> 'direct loan' means a loan of a real estate broker's own funds
> secured by a deed of trust on the residence in foreclosure, which

1
2
3

loan and deed of trust the broker in good faith attempts to assign to a lender, for an amount at least sufficient to cure all of the defaults on obligations which are then subject to a recorded notice of default, provided that…the loan is not made for the purpose or effect of avoiding or evading the provisions of this article.

4  Section 2945.1(b)(3) "exempts real estate brokers who, with their own

5  funds, make direct loans to homeowners secured by a deed of trust on the

6  property." Onofrio v. Rice, 55 Cal. App. 4th 413, 419 (1997). Onofrio

7  further explains that "anyone who solicits borrowers or lenders for loans in

8  connection with secured real property liens '*must hold a real estate*

9  *broker's license.*'" Id. at 420. Moreover, "the section also mandates the

10  broker must in good faith attempt to assign the loan to a lender." Id. at

11  419. The evidence shows that Aram, as an individual, held a real estate

12  broker license, but the broker license was expired from December 5, 2002

13  to September 20, 2007. See Pls.' Ex. 14. However, Aram was a licensed

14  officer of Real/Act, Inc., which held a corporate real estate license, as of

15  September 21, 2007. See Pls.' Ex. 15. Admitted Fact Number 6 of the

16  Joint Pretrial Order states: "Arekelyan has a real estate license as the

17  designated licensee and officer of Real Act, Inc." See Pretrial Order at 2.

18

19       The first question is whether Aram falls within the real estate broker

20  exception under California Civil Code § 2945.1(b)(3) where his individual

21  broker license was expired, but he was still a designated licensed officer

22  of a corporation holding an active real estate license. Aram argues that

23  because of this admitted fact, it is undisputed that Aram held a valid real

24

25

26

1   estate license and the Court must find that Aram falls within the exception

2   under California Civil Code § 2945.1(b)(3).

3       A stipulation that Aram was the designated licensee/officer of Real

4   Act, Inc., and that the Real Act, Inc. corporation real estate license was

5   current does not control the validity of Aram's individual real estate

6   license.  The exception under California Civil Code § 2945.1(b)(3) applies

7   to an individual real estate broker so that the individual's license must be

8   examined.

9       Under California Business and Professions Code § 10130, "It is

10  unlawful for any person to engage in the business, act in the capacity of,

11  advertise or assume to act as a real estate broker or a real estate

12  salesman within this state without first obtaining a real estate license from

13  the department."  Holley v. Crank, 400 F.3d 667, 671 (9th Cir. 2005)

14  explains: "In California, a corporation may hold a real estate broker's

15  license, but only if it designates an officer who is qualified to hold a

16  broker's license to serve as officer/broker of the corporation."  See also

17  Cal. Bus. & Prof. Code §§ 10158 and 10211.  Further, "[a] California

18  corporate real estate broker operates 'only through and because of' the

19  license of its designated officer."  Id.  The designated officer of a licensed

20  real estate corporation must hold a real estate broker's license and cannot

21  use the corporate real estate license as his own individual broker's

22  license.  "Where a corporation is licensed by the Commissioner as a real

23  estate broker [ ], it is required that it appoint a similarly licensed individual

24  

25  

26

as its 'designated real estate broker'". <u>Norman v. Dept. of Real Estate</u>, 93

Cal. App. 3d 768, 776 (1979). Moreover, "[t]he staff analysis for the

Senate Committee on Business and Professions…stated:

*BACKGROUND*: The Business and Professions Code stipulates that a

person or persons applying for a corporate license to practice real estate

must designate in the application an officer of the proposed corporation

*who holds a valid real estate broker's license* [emphasis added]." <u>Holley</u>

<u>v. Crank</u>, 400 F.3d at 672. Thus, the California Business and Professions

Code requires the designated officer to hold a valid real estate broker's

license before a licensed real estate corporation may be formed. Aram's

post-trial argument on this issue simply ignores the plain language of

California Administrative Code Title 10, § 2740 and confuses the

requirement of a "further fee" under Business and Professional Code §

10211 with the requirement of a valid individual license.

It follows that the real estate license of a corporation, such as

Real/Act, Inc., is dependent upon the valid real estate broker's license of

its designated officer and not vice versa. The Department of Real Estate

seeks to regulate actual activity by individuals such as Aram instead of

corporate shells like Real/Act, Inc. Since Aram's real estate broker license

was expired at the time of the financing transaction with Plaintiffs, he did

not hold a valid real estate broker's license and he cannot use Real/Act,

Inc.'s real estate license as his own individual broker's license. Because

Aram's individual real estate broker's license was expired from December

1  5, 2002 to September 20, 2007, he does not qualify as a real estate broker

2  exempt under § 2945.1(b)(3).

3      Even had Aram qualified as a real estate broker at the time of the

4  financing transaction, Aram still would not have been exempt pursuant to

5  California Civil Code § 2945.1(b)(3) because Aram did not make a "direct

6  loan" to Plaintiffs.  First, Aram admitted that he borrowed funds from

7  others and did not lend any of his personal funds to Plaintiffs.  Second,

8  there is insufficient evidence that Aram attempted to assign the loan and

9  deed of trust in good faith to a lender for an amount at least sufficient to

10  cure all of the defaults.  There is also evidence from the circumstances

11  here that the loan was made for the purpose or effect of avoiding or

12  evading the provisions of this article pursuant to § 2945.1(b)(3),

13  considering the cash Aram took out of the property along with his attempts

14  to disguise it.  Therefore, Aram does not fall within the exemption

15  described in California Civil Code § 2945.1(b)(3).

16

17      The MFCA was enacted because foreclosure consultants "often

18  charge high fees, the payment of which is often secured by a deed of trust

19  on the residence to be saved, and perform no service or essentially a

20  worthless service."  Cal. Civil Code. § 2945.  Vulnerable homeowners in

21  danger of a foreclosure "are diverted from lawful businesses which could

22  render beneficial services."  § 2945.  "This results in the homeowner

23  paying an exorbitant fee for a service when the homeowner could have

24  obtained the remaining funds from the trustee's sale from the trustee

25

26

1   directly for minimal cost if the homeowner had consulted legal counsel or

2   had sufficient time to receive notices from the trustee…" § 2945.  In the

3   present case, Plaintiffs were exactly the type of vulnerable homeowners

4   the MFCA was enacted to protect.  They ended up paying exorbitant fees

5   for the foreclosure consultant's assistance, which ultimately resulted in

6   double or triple their original mortgage payments and eventual foreclosure

7   on the home they tried to save.

8          This case raises disturbing questions of whether homeowners

9   should be held accountable for documents they signed without reading

10  and understanding them.  Under California law, "when a person with the

11  capacity of reading and understanding an instrument signs it, he is, in the

12  absence of fraud, [misrepresentation,] and imposition, bound by its

13  contents, and is estopped from saying that its provision is contrary to his

14  intentions or understanding."  Dobler v. Story, 268 F.2d 274, 277 (9th Cir.

15  1959).  As discussed below, the Court finds that there was fraud and

16  misrepresentation involved, and Plaintiffs were deceived by Defendants'

17  actions.  Danny's sister, Irma, testified that Danny and Diane "are not the

18  smartest people in the world," a conclusion supported by the court's

19  assessment of Plaintiffs during trial.  More importantly, the legislature

20  made the determination by enacting MCFA that homeowners, such as

21  Plaintiffs, should be protected with additional safeguards when dealing

22  with foreclosure consultants.  Since Aram failed to obtain a written

23

24

25

26

contract from Plaintiffs pursuant to California Civil Code § 2945 et. seq.,

the Court finds in favor of Plaintiffs that Aram violated the MCFA.

Pursuant to California Civil Code § 2945.6, Plaintiffs are entitled to

judgment "for actual damages, reasonable attorneys' fees and costs, and

appropriate equitable relief."  Moreover, the Court, in its discretion, may

award exemplary damages equivalent to at least three times the

compensation received by the foreclosure consultation in violation of

subdivision (a), (b), or (d) of § 2945.4, and three times the owner's actual

damages for any violation of subdivision (c), (e), or (g) of § 2945.4, in

addition to any other award of actual or exemplary damages.  Cal. Civil

Code § 2945.6.  Because Plaintiffs were the type of homeowners that the

MCFA intended to protect and Aram's actions were exactly the type of

action that the MCFA intended to punish, the Court finds that treble

damages are warranted.  Thus, the Court finds in favor of Plaintiffs on this

cause of action and awards damages and treble damages.

C.  Claim for Relief under Intentional Misrepresentation:

The elements of intentional misrepresentation are: (1)

misrepresentation (false representation, concealment, or nondisclosure);

(2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce

reliance); (4) justifiable reliance; and (5) resulting damage.  Anderson v.

Deloitte & Touche, 56 Cal. App. 4th 1468, 1474 (1997).  Specifically, to

prevail on a claim for relief under intentional misrepresentation, Plaintiffs

must prove: (1) defendant represented to the plaintiff that an important fact

was true; (2) that representation was false; (3) the defendant knew that
the representation was false when the defendant made it, or the defendant
made the representation recklessly and without regard for its truth; (4) the
defendant intended that the plaintiff rely on the representation; (5) the
plaintiff reasonably relied on the representation; (6) the plaintiff was
harmed; and (7) the plaintiff's reliance on the defendant's representation
was a substantial factor in causing that harm to the plaintiff.  Manderville v.
PCG & S Group, Inc., 146 Cal. App. 4th 1486, 1498 (2007).  The plaintiff
must prove each element by a preponderance of evidence.  See Stoner v.
Williams, 46 Cal. App. 986, 933 (1996).

Plaintiffs alleged that Aram made the following misrepresentations:
(1) representation to Plaintiffs that the only way to save the Property from
foreclosure was to sell the Property to Sasun; (2) representation to
Plaintiffs that the only compensation Aram would receive from the
transaction was $5,000; (3) failing to disclose to Plaintiffs that Aram
intended to place a demand in the amount of $82,722.78 into escrow for
an alleged second trust deed which was never recorded against the
Property, for which Plaintiffs never received the proceeds and without
Plaintiffs' consent or approval; (4) failing to disclose to Plaintiffs that Aram
intended to place a demand in the amount of $78,899.00 in escrow for an
alleged third trust deed which was never recorded against the Property,
for which Plaintiffs never received the proceeds and without Plaintiffs'
consent or approval; and (5) failing to disclose to Plaintiffs that Sasun

1    intended to execute a second trust deed in the face amount of $29,000.00.

2    See Complaint at 7.

3        A misrepresentation includes a concealment or nondisclosure.

4    Cadio v. Owens-Illinois, Inc., 125 Cal. App. 4th 513, 519 (2004).  Non-

5    disclosure is ordinarily not actionable unless the defendant has some duty

6    to disclose.  See Schaefer v. Robbins & Keehn, LLP., 2007 WL 935543 at

7    4 (S.D. Cal.).  Focusing on the alleged misrepresentation that the only way

8    to save the Property from foreclosure was to sell the Property to a

9    strawperson or Sasun, the first element of intentional misrepresentation is

10   met because Plaintiffs proved that Aram represented to Plaintiffs that the

11   only way to save the Property was to sell it to a strawperson.

12       Plaintiffs also proved the second element, that the representation was

13   false.  The evidence shows that Plaintiffs did not need to sell the Property to a

14   strawperson in order to save the Property.  The whole purpose of selling the

15   Property to a strawperson, Sasun, was so that Aram could cash out and

16   essentially take Plaintiffs' equity in the Property.  Thus, the evidence shows that

17   Aram's representation was false—the sale to a strawperson was to steal equity,

18   not save the property.  It was apparent Diane and Danny could not carry the

19   higher payments required to keep the property once the strawman's loan was in

20   place.

21

22       Plaintiffs also proved the third element, that the defendant knew that the

23   representation was false when the defendant made it, or the defendant made the

24   representation recklessly and without regard for its truth.  "Where a person

25

26

27

makes statements which he does not believe to be true, in a reckless manner without knowing whether they are true or false, the element of *scienter* is satisfied and he is liable for intentional misrepresentation." <u>Yellow Creek Logging Corp. v. Dare</u>, 216 Cal. App. 2d 50, 57 (1963).  Moreover, "[a] representation made recklessly without knowledge of its falsity is sufficient to establish scienter." <u>Textron Financial Corp. v. National Union Fire Ins.</u>, 118 Cal. App. 1061, 1073 (2004).  There is enough evidence to show that Aram, at the very least, made the representation recklessly.  Since the October 2005 foreclosure sale was already cancelled and the default was cured, Plaintiffs could have pursued other options aside from selling their home to a strawperson.  The evidence shows that Aram told Plaintiffs that the only way to save the Property was to sell it to a strawperson so that he could take the equity from the Property. Thus, Plaintiffs proved that Aram made the representation recklessly and without regard for its truth.

Plaintiffs also proved the fourth element of intentional misrepresentation, that the defendant intended that the plaintiff rely on the representation.  Although Aram denies any knowledge or involvement with the transaction, the testimony of Diane and Tommia and evidence of other similar transactions show that Aram intended that Plaintiffs rely on the representation.  Aram made representations to Plaintiffs so that they would sell their home to a strawperson and give Aram an opportunity to take the equity from the Property.  Thus, the evidence shows that Aram intended the Plaintiffs to rely on the representation.

1    Plaintiffs proved the fifth element – that the plaintiff reasonably relied on

2 the representation.  The question of whether or not Plaintiffs' reliance was

3 reasonable is generally a question of fact.  Manderville v. PCG & S Group, Inc.,

4 146 Cal. App. at 1498-1499.  The issue is "whether the person who claims

5 reliance was justified in believing the representation in light of his own knowledge

6 and experience."  Gray v. Don Miller & Associates, Inc., 35 Cal. 498, 553-554

7 (1984).  "Negligence on the part of the plaintiff in failing to discover the falsity of a

8 statement is no defense when the misrepresentation was intentional rather than

9 negligent."  Alliance Mortgage Co. v. Rothwell, 10 Cal. 4th 1226, 1239-1240

10 (1995).  The plaintiff is not "held to the standard of precaution or of minimum

11 knowledge of a hypothetical, reasonable man," but "[i]f the conduct of the plaintiff

12 in the light of his own intelligence and information was manifestly

13 unreasonable…he will be denied a recovery."  Id. at 1240.

14    Aram introduced evidence that Plaintiffs received a flyer from the

15 Department of Consumer Affairs and questioned why they did not call for help if

16 they suspected there was real estate fraud.  See Defs.' Ex. 121.  Plaintiffs were

17 vulnerable and unsophisticated first-time home owners, and neither of them

18 appeared to realize the extent of the transaction and possible bank fraud they

19 were committing.  Plaintiffs also appeared to be ignorant of how loan financing

20 works, and they appeared to believe everything that Aram told them if it meant

21 that they could save the Property.  At the time notice arrived, Plaintiffs did not yet

22 suspect a fraud.  The significance of this notice was not clear until later.  Thus,

23 based on Plaintiffs' knowledge, experience, lack of sophistication, and the stress

24

25

26

1
2
they were experiencing from the possible foreclosure of their home, the Court
finds that Plaintiffs' reliance was reasonable under the circumstances.[10]

3
4
5
6
7
8
9
10
Plaintiffs also proved that the sixth element, that plaintiff was harmed, was met.  Plaintiffs were harmed because Aram essentially took their equity in the Property.  Although Plaintiffs signed documents stating that they received this amount in cash, as discussed above, the evidence shows that Plaintiffs only received approximately $19,800.00 from the transaction.  Moreover, the Property was ultimately foreclosed upon after the "refinancing" because Plaintiffs could no longer afford the increased mortgage costs after the sale of the Property to Sasun.  Thus, the Court finds that Plaintiffs were harmed.

11
12
13
14
15
16
17
18
19
20
Finally, Plaintiffs proved the last element of intentional misrepresentation, the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff.  The evidence shows that if Plaintiffs had not relied on Aram's representation, they would not have lost their home and lost most, if not all, of the equity in the Property.  Without Aram's representation that the only way to save the Property was to sell it to a strawperson, Plaintiffs would never have done such a transaction.  Thus, the Court finds that Plaintiffs' reliance on Aram's representation was a substantial factor in causing the harm to Plaintiffs.

21
22
Therefore, the Court finds in favor of Plaintiffs that Aram is liable for intentional misrepresentation to Plaintiffs and is liable for damages

23
24
25
_____
[10] Tommia's testimony of a nearly identical process used to take her equity demonstrates the manner in which unsophisticated first time homeowners are frequently victimized despite notices and warnings.  Tommia's testimony was admitted under Federal Rule of Evidence 404(b) as a common plan or modus operandi.  See United States v. McCourt, 925 F.2d 1229, 1233 (9th Cir. 1991); United States v. Miller, 874, F.2d 1255, 1268 (9th Cir. 1989).

26

D. Claim under Negligent Misrepresentation against Aram:

The elements of negligent misrepresentation are: (1) the misrepresentation of a past or existing material fact; (2) without reasonable grounds for believing it to be true; (3) with intent to induce another's reliance on the fact misrepresented; (4) justifiable reliance on the misrepresentation; and (5) resulting damages.  Apollo Capital Fund, LLC v. Roth Capital Partners, 158 Cal. App. 226, 243 (2007).  There is no requirement of falsity.  Id.  Moreover, "[a] positive assertion is required; an omission or implied assertion or representation is not sufficient."  Id.

Based on the above discussion of the intentional misrepresentation cause of action, the plaintiffs have also proven this cause of action.

E.  Claim Under Fraudulent Transfer Against Aram and Anahita:

Under California Civil Code § 3939.04(a):

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either: (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

California Civil Code § 3439.04(b) provides:

In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following: (1) Whether the transfer or obligation was to an insider; (2) Whether the debtor retained possession or control of the property transferred after the transfer; (3) Whether the transfer or

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

obligation was disclosed or concealed; (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) Whether the transfer was of substantially all of the debtor's assets; (6) Whether the debtor absconded; (7) Whether the debtor removed or concealed assets; (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; (11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

A transfer made by a debtor is fraudulent under the Uniform Fraudulent Transfer Act ("UFTA") if the debtor made the transfer with the actual intent to hinder, delay or defraud any creditor of the debtor.  Filip v. Bucurenciu, 129 Cal. App. 4th 825, 834 (2005).  "Whether a conveyance was made with fraudulent intent is a question of fact, and proof often consists of inferences from the circumstances surrounding the transfer."  Id.  Only one of the elements of § 3949.04(a)—either (a)(1) or (a)(2)--needs to be met to prevail under UFTA.  See In re Ponce Nicasio Broadcasting, LP, 2008 WL 361081 (Bankr. E.D. Cal. 2008).

Plaintiffs proved that there was a conveyance or transfer made between Aram and Anahita.  Pursuant to the Pretrial Order, Aram admits that he transferred title to the property known as Unit 204, 345 W. Alameda Avenue, Burbank, CA 91506 (the "Alameda property") to his wife, Anahita, in March 2007 for no consideration.  See Pretrial Order at 3.

To determine whether or not Aram made the transfer of the Alameda property with actual intent to hinder, delay, or defraud Plaintiffs pursuant to California Civil Code § 3439.04(a)(1), the Court looks at the factors under

California Civil Code § 3439.04(b).  "There is no minimum number of factors that must be present before the scales tip in favor of finding actual intent to defraud. This list of factors is meant to provide guidance to the trial court, not compel a finding one way or the other."  Filip v. Bucurenciu, 129 Cal. App. 4th 825, 834 (2005).  Under the first factor of § 3439.04(b)(1), the transfer was to an insider because Anahita is Aram's wife.  Under the second factor of § 3439.04(b)(2), Plaintiffs showed that Aram retained possession or control of the Alameda property after the transfer because he continues to live in it.  Under the third factor of § 3439.04(b)(3), the transfer was not concealed because Aram recorded a quitclaim deed on December 21, 2006.  See Pls.' Ex. 23.  The fourth factor of § 3439.04(b)(4) is inextricably intertwined with the fraud scheme Aram was perpetrating.  While Plaintiffs did not threaten to sue Aram before the transfer was made, Irma and Plaintiffs were contacting Aram about the financing transaction of the Property and Aram knew that Plaintiffs were unhappy about the transaction and had discovered the true facts of what he had done with their property.  Moreover, Aram transferred the Alameda property days after Danny filed for bankruptcy and retained an attorney who could finally review what had gone on.  Under the fifth factor of § 3439.04(b)(5), Plaintiffs alleged that the Alameda property was the only property under Aram's name and the transfer left Aram judgment proof.  Aram's testimony confirmed that the Alameda property was the only asset in his name at the time, so the transfer to Anahita was a transfer of substantially all of Aram's assets.

1  Aram did not abscond, so the sixth factor of § 3439.04(b)(6) does not

2  apply here.  Under the seventh factor of § 3439.04(b)(7), Plaintiffs proved that

3  Aram concealed assets in that Aram admitted he kept no assets in his name

4  whatsoever.  He claimed that this was due to his throat cancer and his desire to

5  provide for his wife.  As there are numerous other ways to accomplish this other

6  than rendering himself judgment proof, this justification rings false.  The asset

7  transfers occurred at the same time he was carrying out numerous frauds and

8  not in response to a sudden illness.  Under the eighth factor of § 3439.04(b)(8),

9  Plaintiffs proved that Aram transferred the property for no consideration and

10  received nothing in return.  Under the ninth factor, Aram admitted that he was

11  essentially insolvent or became insolvent shortly after the transfer because the

12  transfer rendered Aram judgment proof.  Under the tenth factor of §

13  3439.04(b)(10), the transfer occurred shortly after a substantial debt was incurred

14  because the fraud perpetrated by Aram caused him to be indebted to Plaintiffs.

15  The eleventh factor of § 3439.04(b)(11) does not apply here.

16  

17  Considering the factors enumerated in § 3439.04(b), Aram transferred the

18  Alameda property to Anahita with "actual intent to hinder, delay, or defraud"

19  Plaintiffs.  Aram testified that he did not own any assets under his name because

20  of health reasons, specifically cancer.  However, Aram's own testimony showed

21  that Aram suffered from cancer in 2001, and there is no explanation of why Aram

22  suddenly needed to transfer the Alameda property in December 2006.  Aram

23  also testified that Anahita paid for the Alameda property but that he had no

24  evidence of such payments.  Furthermore, Aram testified that Anahita did not

25  

26  

34

sign anything in relation to the purchase of the property.  Coincidentally, a few

months prior to time of the transfer in December 2006, Irma began

communications with Aram to try to reinstate the loan on the Property and

Plaintiffs contacted Aram about the problems with mortgage payments they were

facing with respect to the Property.  Considering the facts and inferences from

the circumstances surrounding the transfer, the evidence shows that Aram

transferred the Alameda property to Anahita foreseeing that trouble or a lawsuit

may eventually arise out of Plaintiffs' selling of the Property to Sasun.

Furthermore, the Court finds Aram's explanation of why the transfer took place at

that time to be not credible.  Aram failed to explain why his cancer experience

five years ago led to the immediate need to transfer the Alameda property to

Anahita.  It is highly questionable that Anahita paid all the money for the Alameda

property, but there are no documentations of the money she paid nor did she

sign anything when purchasing the Alameda property.  It is also too convenient

that Aram owns no assets under his name while operating a loan company

dealing with large amounts of cash and working with vulnerable owners on the

verge of foreclosures.  Thus, the Court finds from the evidence that Aram

transferred the Alameda property with the actual intent to hinder, delay, or

defraud Plaintiffs pursuant to § 3439.04(a)(1).

Next, the Court must determine if § 3439.04(a)(2), or constructive fraud,

applies.  Plaintiffs proved that Aram did not receive "a reasonably equivalent

value in exchange for the transfer or obligation" because it is undisputed that

Aram transferred the Alameda property to his wife for no consideration as a gift.

1   Plaintiffs argue that Aram "[w]as engaged or was about to engage in a business

2   or a transaction for which the remaining assets of the debtor were unreasonably

3   small in relation to the business or transaction" pursuant to § 3439.04(a)(2)(A).

4   There is little guidance under California law as to what constitutes "unreasonable

5   small assets." In re Pajaro Dunes Rental Agency, Inc., 174 B.R. 557, 591

6   (Bankr. N.D. Cal. 1994), a case decided before the amendments of the UFTA

7   took place in 2004, explains:

8          There is no definition of the [unreasonable small assets] test in the
           Code.  Courts have split on the proper application of the test, with
9          some holding that insolvent debtors have inadequate capital *per se*.
           At least one court has held that the [unreasonable small assets]
10         test is triggered even when the debtor is solvent, but the transfer
           has placed in motion 'difficulties' that have already led, or will likely
11         lead to insolvency.  Other decisions use language supporting a
           more relativistic, case-by-case approach.  Under this approach, the
12         court should weigh the raw financial data of the balance sheet
           against the nature of the entity and its need for capital over time.  A
13         third approach to the [unreasonable small assets] test…focuses on
           the debtor's future ability to generate cash and pay its debts as they
14         come due.

15  It is difficult to say that Aram was undercapitalized per se.  His business

16  appeared to revolve around lending out money borrowed from others and selling

17  properties in default to a strawperson to cash out equity.  So, there was not much

18  of a need for capital in his business.  There is also no evidence that Aram or his

19  business were unable to pay its debts as they became due.  Thus, the Court

20  finds that the elements of § 3439.04(a)(2)(a) are not met.

21         In conclusion, the Court finds that Aram and Anahita are liable for

22  fraudulent transfer of the Alameda property pursuant to § 3439.04(a)(1).  Thus,

23  Plaintiffs are entitled to the remedies pursuant to § 3439.07.

24

25

26

F.  Defendant's Affirmative Defense of Unclean Hands:

1

2        The party seeking the application of the unclean hands doctrine generally

3   bears the burden of proving each element.  Hynix Semiconductor Inc. v.

4   Rambus, Inc., 2006 WL 565893 at 20 (N.D. Cal. 2006).  The doctrine of unclean

5   hands is heavily fact dependent.  Crosstalk Productions, Inc. v. Jacobson, 65

6   Cal. App. 4th 631, 641 (1998).  "Unclean hands, unlike 'do equity,' requires

7   inequitable conduct by the plaintiff in connection with the matter in controversy

8   and provides a complete defense to the plaintiff's action."  Dickson, Carlson &

9   Campillo v. Pole, 83 Cal. App. 436, 446 (2000).  Unclean hands only applies

10  where it would be inequity to grant the plaintiff *any* relief.  Id.  "The court must

11  consider both the degree of harm caused by the plaintiff's misconduct and the

12  extent of the plaintiff's alleged damages."  Id. at 446-447.  Finally, "[t]he decision

13  of whether to apply the defense based on the facts is a matter within the trial

14  court's discretion."  Id. at 447.

15

16       Defendants have failed to sufficiently prove that the unclean hands

17  doctrine applies.  Defendants showed little evidence at trial regarding this

18  affirmative defense, and there was little argument about the application of

19  unclean hands.  Although there are certain things that Plaintiffs should have or

20  could have done, such as calling the Department of Consumer Affairs, the

21  evidence shows that Plaintiffs were vulnerable and unsophisticated.  While

22  Plaintiffs were ignorant, or even willfully ignorant, of the loan financing and of the

23  papers they signed, they were overcome and taken in by the scheme Aram

24  devised.  Here, the degree of Plaintiffs' damages was substantial, as they lost the

25

26

1  equity in their home and ultimately their home, while the degree of Plaintiffs'

2  harm caused by misconduct was small in comparison.  Moreover, Plaintiffs'

3  ignorance and conduct were exactly what Aram preyed on and predicted.  Thus,

4  the Court finds that the doctrine of unclean hands does not apply.

5  G.  Defendants' Affirmative Defense of Ratification:

6          Defendants argue that Plaintiffs ratified the payoff of the loans from Aram

7  by participating in the sale of their residence to Sasun.  To the extent that

8  Defendants rely on the loan documentation Plaintiffs signed in support of this

9  theory, the earlier discussion concerning these documents controls here to reject

10  this defense as well.   The defense of ratification does not apply under these

11  circumstances.

12  **III. CONCLUSION**:

13          On Plaintiffs' first claim for relief for violation of HESCA under California

14  Civil Code § 1695 et. seq., the Court finds: (1) in favor of Aram that he did not

15  violate HESCA and (2) in favor of Plaintiffs that Sasun did violate HESCA.  On

16  Plaintiffs' second claim for relief for violation of the MFCA under California Civil

17  Code § 2945 et. seq., the Court finds in favor of Plaintiffs that Aram violated the

18  MFCA.  On Plaintiffs' third claim for relief for intentional misrepresentation

19  against Aram, the Court finds in favor of Plaintiffs that Aram is liable for

20  intentional misrepresentation.  On Plaintiffs' fourth claim for relief for negligent

21  misrepresentation, the Court finds in favor of Plaintiffs that Aram is liable for

22  negligent misrepresentation.  On Plaintiffs' fifth claim for relief for fraudulent

23

24

25

26

1   transfer under the UFTA under California Civil Code § 3439 et. seq., the Court

2   finds in favor of Plaintiffs that Aram and Anahita violated the UFTA.

3          Plaintiffs shall be awarded damages, including treble damages pursuant to

4   the MFCA, and other remedies.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   DATED: September 10, 2008

_____
United States Bankruptcy Judge

25

26

1

2                                    <u>**SERVICE LIST FOR ENTERED ORDER**</u>

3

4

| SERVED ELECTRONICALLY | SERVED BY U.S. MAIL |
|---|---|
| Simon & Resnik, LLP<br>15233 Ventura Blvd., Suite 300<br>Sherman Oaks, CA 91403<br>Email: kevin@ktsimonlaw.com<br><br>**Richard M Moneymaker**<br>515 S Figueroa St Ste 1020<br>Los Angeles, CA 90071<br>Email: rmm@moneymakerlaw.com<br><br>**United States Trustee (SV)**<br>21051 Warner Center Lane, Suite 115<br>Woodland Hills, CA 91367 | **Alberto J Campain**<br>2029 Century Park East 21st Fl<br>Century City, CA 90067<br><br>**Elliot S Blut**<br>2029 Century Park East Ste 1700<br>Los Angeles, CA 90067 |